_Verified Correct Copy of Original 9/2/2025._

FILED 4TH JUDICIAL DIST.
2025 AUG 29 PM3:38

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| IRICIA SPENCER-SANCHEZ, an individual,<br>Plaintiff,<br>v.<br>CRESTVIEW OPERATIONS, LLC, a domestic limited liability company, doing business as AVAMERE CRESTVIEW OF PORTLAND<br>Defendant. | Case No. 25CV47986<br>COMPLAINT<br>EMPLOYMENT DISCRIMINATION<br>OREGON WORKPLACE ACCOMMODATIONS FOR PREGNANCY ACT<br>WRONGFUL TERMINATION<br>UNPAID WAGES<br>CLAIMS NOT SUBJECT TO MANDATORY ARBITRATION<br>FILING FEE: ORS 21.160(1)(c)<br>TOTAL CLAIMS: $139,980.32 |

COMES NOW Iricia Spencer-Sanchez, Plaintiff Pro Se, and files this Complaint against Crestview Operations, LLC, doing business as Avamere Crestview of Portland, and in support thereof, states as follows:

## ALLEGATIONS COMMON TO ALL CLAIMS

1.

Iricia Spencer-Sanchez is an individual residing in Portland, Oregon (hereinafter, "Plaintiff").

///

///

///

_Verified Correct Copy of Original 9/2/2025._

2.

Crestview Operations, LLC, is a domestic limited liability company, formed under the laws of Oregon and doing business in the State of Oregon under the assumed business name of "Avamere Crestview of Portland" (hereinafter, "Defendant").

3.

Plaintiff began working for Defendant as a CNA on or about May 14, 2025. She was a full-time hourly employee, earning $24.89 per hour, and was a member of SEIU Local 503 per the union contract. Throughout her employment, Plaintiff performed her duties competently and received no disciplinary warnings prior to the events in question.

4.

In June 2025, Plaintiff discovered she was pregnant and promptly notified Defendant's management of her pregnancy and anticipated need for certain accommodations. By late June 2025, Plaintiff had informed her supervisors and the staffing office that she was pregnant and would require lighter-duty assignments due to pregnancy-related lifting restrictions. Plaintiff provided proof of pregnancy, on or around June 30, 2025, by showing an ultrasound image to her supervisor.

5.

Plaintiff's healthcare provider subsequently recommended that Plaintiff be placed on light duty during her pregnancy. In a letter dated July 18, 2025, Plaintiff's nurse practitioner stated it was "medically advisable that she be provided with light duty accommodations for the duration of her pregnancy," including temporary restrictions such as avoiding lifting more than 25 pounds, avoiding prolonged standing without breaks, avoiding repetitive bending or twisting, avoiding high-paced strenuous tasks, and allowing for seated or less physically demanding duties. These

_Verified Correct Copy of Original 9/2/2025._

precautions were advised to protect Plaintiff's health and her pregnancy. Defendant was aware that Plaintiff was obtaining this doctor's note; in fact, Plaintiff informed her supervisors in mid-July that she had an upcoming appointment to get the formal letter. However, Defendant terminated Plaintiff before she could deliver the doctor's note, despite knowing it was forthcoming.

6.

Beginning in late June 2025, Plaintiff requested reasonable accommodations for her pregnancy. She asked to be assigned to lighter workloads or to have assistance for heavy tasks (such as a second aide to help with lifting). When her initial requests were brushed off by scheduling staff, Plaintiff even cited the federal law protecting pregnant workers to underscore that she had a right to accommodations. Despite Plaintiff's persistent requests, Defendant failed to provide any accommodations throughout the remainder of her employment. Instead, management responded that Plaintiff could either accept the assigned work or go home unpaid, offering no adjustments for her pregnancy. On one occasion around the end of June, a supervising nurse expressly told Plaintiff "you can take the assignment or leave" when Plaintiff asked for a lighter assignment due to her pregnancy. Feeling coerced and fearing loss of income, Plaintiff reluctantly continued working under the same strenuous conditions.

7.

After learning of Plaintiff's pregnancy, Defendant's staff began treating her differently and unfairly. Plaintiff was regularly assigned the most physically demanding tasks and sections of the facility, even when other staff were available.

8.

Plaintiff also observed that certain favored employees were exempted from rotating through more difficult halls, receiving permanent lighter assignments, while she was pushed into

_Verified Correct Copy of Original 9/2/2025._

more demanding rotations. On one occasion, co-workers attempted to force Plaintiff to take a unit she was not assigned, while refusing to adjust their own assignments. Plaintiff had to resist this pressure simply to work her designated section. This favoritism and coercion reflected a broader pattern of bullying and unequal treatment that intensified after her pregnancy was disclosed.

9.

In fact, co-workers took advantage of Plaintiff's absence from pre-shift huddles to assign her to the hardest unit. On one night in early July (shortly after her pregnancy disclosure), all the other CNAs and the nurse in charge convened and gave Plaintiff the hardest section, specifically because Plaintiff was not present to object, and they knew she was pregnant.

10.

On another occasion a few weeks later, Plaintiff discovered that her originally posted assignment had been changed last-minute to put her in the most demanding section; Plaintiff had to appeal to the charge nurse to get it switched back to a safer assignment. A co-worker, Yadira Beltran, witnessed these events and confirmed that after Plaintiff's pregnancy became known, management and other staff intentionally gave Plaintiff heavier workloads, even though such treatment was unprecedented before her pregnancy. Other employees remarked that this started "weeks after she had told them about her pregnancy".

11.

Defendant's refusal to accommodate Plaintiff is further highlighted by how it treated other employees with temporary physical limitations. For example, around that time, two of Plaintiff's co-workers were given help or lighter duty when they had physical difficulties or injuries. Yet, when Plaintiff (who was pregnant) requested similar relief, the nursing staff told her she had only two choices: "take the section or go home." In a text message to the staffing office, Plaintiff

_Verified Correct Copy of Original 9/2/2025._

protested this unfairness, noting that "They accommodated Edwin and Star, [but] me only being given the option 'to take the section or go home' by the nurse is absolutely not okay.". This disparate treatment left Plaintiff feeling singled out and punished for being pregnant.

12.

In addition to onerous assignments, Plaintiff was subjected to disparaging remarks and harassment by Defendant's staff because of her pregnancy. For instance, one of Defendant's nurses, Nurse Blair, made an inappropriate comment to Plaintiff in front of others, saying: "You told me you were pregnant, so I will let that slide." This remark implied that Plaintiff's pregnancy was being viewed as an excuse for poor performance or behavior—a characterization that was offensive and unwarranted. Plaintiff immediately told Nurse Blair that the comment was inappropriate and that she would be reporting it. Plaintiff did report Nurse Blair's comment to the facility Administrator (Sarah Tijerina) or management, but no remedial action was apparent.

13.

Plaintiff also submitted written documentation to Administrator Tijerina describing retaliation, bullying, and false narratives being spread about her. Despite this clear notice, management took no corrective action, further evidencing deliberate indifference.

14.

On June 22, 2025, Plaintiff further experienced retaliatory conduct from staff who were not even present during the June 21 incident with Nurse Blair. Co-workers began spreading false accusations that Plaintiff had shown "an attitude" and had gone to staffing improperly. These individuals were not on duty during the event yet created a false narrative designed to discredit Plaintiff and isolate her from colleagues. As a result of this gossip, Plaintiff was treated differently by staff, reinforcing the hostile and retaliatory environment.

_Verified Correct Copy of Original 9/2/2025._

15.

On July 5, 2025 (which turned out to be Plaintiff's last day of active work), Plaintiff was targeted in a hostile conversation by two of her co-workers, "Kerrie" and "Bree" (both nurses or nursing staff). Toward the end of her shift, Plaintiff overheard Kerrie and Bree talking negatively about her in relation to her pregnancy. Specifically, they were "making statements [that] 'she's using her pregnancy as an excuse – I worked all the way up to my 30 weeks'", and other dismissive remarks. When Plaintiff came into the area, Kerrie and Bree immediately fell silent, indicating that they had indeed been referring to her. Shocked and hurt, Plaintiff promptly reported what she heard to the Charge Nurse, Luci. Luci then gathered Bree and another nurse (Aimee) to address the situation. In a private meeting (in the medication room), Plaintiff confronted Bree about the conversation. Bree admitted that they had been talking about Plaintiff's pregnancy, though she tried to shift blame by saying that Kerrie was the one who brought it up. Plaintiff told Bree that this discussion was inappropriate and unprofessional, and that regardless of who started it, it should have been stopped immediately. Plaintiff stated that she was offended by their remarks and clearly asked Bree (and the others) to stop making comments about her pregnancy. Plaintiff also warned that she would be continuing to report such misconduct to her union and management if it persisted. In response, Bree became defensive and issued a veiled threat – telling Plaintiff words to the effect of: "If you want to play that game, I'll report you for taking your 15[-minute] break at the end of shift…". In other words, rather than apologizing, Bree threatened to get Plaintiff in trouble for a trivial infraction because Plaintiff stood up for herself and mentioned reporting the harassment. This incident left Plaintiff extremely distressed.

///

///

_Verified Correct Copy of Original 9/2/2025._

16.

Immediately after the confrontation on July 5, Plaintiff felt humiliated and unsupported. Fearing further hostility, Plaintiff decided it was best to leave the hostile environment for her own well-being. She clocked out and left at the end of that shift. Plaintiff's decision to clock out was a direct result of the intolerable harassment and stress she was under, not because she wished to abandon her job. She had, in fact, attempted to resolve the issue through proper channels (by reporting to the charge nurse) before taking the step of leaving for the day.

17.

Following the events of July 5, Defendant effectively removed Plaintiff from the work schedule entirely. On or about July 11, 2025, Plaintiff was informed by a supervising nurse (John) that she was being taken "off the schedule" until a meeting could be arranged with management. Nurse John did not give any specific reason or justification, saying he himself "did not know" why management ordered Plaintiff off the schedule. This abrupt removal occurred just days after Plaintiff's complaints about harassment and her insistence on accommodations, and while she was still in the process of obtaining the doctor's note. Plaintiff had never requested to be taken off work; to the contrary, she wanted to continue working with appropriate accommodations.

18.

Plaintiff, a union member, immediately contacted her union representative about being taken off the schedule. In response, Defendant's management falsely told the union that Plaintiff had requested to be taken off the schedule. This statement was entirely untrue—Plaintiff had made no such request. Plaintiff was able to prove the falsity of Defendant's claim by producing text messages and communications showing she never asked for a removal from schedule. The union

_Verified Correct Copy of Original 9/2/2025._

confronted the employer with this evidence. Defendant had no legitimate explanation for why it had sidelined Plaintiff, further indicating that the action was retaliatory and/or discriminatory.

19.

Ultimately, Defendant terminated Plaintiff's employment outright. Although the exact date of the official termination is unclear to Plaintiff, it effectively occurred around July 11, 2025, when Plaintiff was barred from working further. Plaintiff was never returned to the schedule after that date, and she was informed verbally that she was done working pending the "meeting." No such meeting ever took place; instead, Defendant treated her employment as ended. Plaintiff did not voluntarily quit at any time. In mid-August 2025—after Plaintiff involved her union and an attorney—Defendant finally provided a termination letter (through the union) dated retroactively, confirming that Plaintiff's employment had been terminated. Plaintiff was thus out of work while pregnant, with no income or benefits, as a direct result of Defendant's actions.

20.

The termination was unjustified. Plaintiff was ostensibly still in her 90-day probationary period (which would have ended in mid-August 2025), and Defendant may claim she was let go during probation. However, the timing and circumstances demonstrate that the true motive was Plaintiff's pregnancy and her related requests/complaints. Plaintiff's work performance was satisfactory; she had received no write-ups or poor evaluations. The only "issues" raised coincided with her insistence on accommodations and her reporting of harassment. Indeed, one of Defendant's agents (Bree) essentially threatened to lodge a complaint about Plaintiff taking a break, in retaliation for Plaintiff's union report—indicating that any purported misconduct by Plaintiff was either fabricated or exaggerated as pretext. Plaintiff never engaged in any serious misconduct that would warrant termination.

_Verified Correct Copy of Original 9/2/2025._

21.

After terminating Plaintiff, Defendant changed its workplace policies to address the very issue at the heart of this case—pregnancy accommodations. Plaintiff learned from her union that, in the wake of her termination, Defendant implemented a new "pregnancy accommodation process" or policy that had not existed previously. This update only after the fact suggests that Defendant recognized it had failed to have proper measures in place during Plaintiff's tenure. The timing of this change (post-termination) is an implicit admission that Defendant's prior approach to pregnant employees (i.e. how it treated Plaintiff) was insufficient or unlawful. Had such a policy or process been in place when Plaintiff was employed, she likely would have received the accommodations she needed instead of being forced out.

22.

Plaintiff, with the help of her union, filed a grievance protesting her removal and termination as being unjust and discriminatory. The union investigated and supported Plaintiff's claims, particularly noting the lack of accommodations and the false statements made by management. As part of the grievance process, the union requested documentation from Defendant, including any termination letter and the employee handbook. Defendant was slow to respond. Eventually, on August 19, 2025, the union obtained a copy of Plaintiff's termination notice and an updated handbook (which included the new pregnancy accommodation provisions). The grievance was pursued on the grounds that Defendant violated the collective bargaining agreement (e.g. by terminating without just cause and failing to accommodate) as well as state/federal law. The outcome of the grievance is pending.

///

///

_Verified Correct Copy of Original 9/2/2025._

23.

When Defendant terminated Plaintiff around July 11, 2025, it failed to pay her final wages on time as required by Oregon law. Plaintiff had worked shifts in the first week of July 2025 (including July 5) for which she was owed wages. Under ORS 652.140, because Plaintiff was involuntarily terminated, her earned wages were due no later than the end of the next business day (approximately July 14, 2025). However, Defendant did not issue Plaintiff's final paycheck by that deadline. In fact, Defendant did not deliver Plaintiff's final pay until on or about July 25, 2025 (on what would have been a normal payday). This was approximately 11 days late. Plaintiff had to involve her union and potentially BOLI to get her final paycheck.

24.

The ordeal Plaintiff experienced at Avamere Crestview caused her significant emotional and physical distress. She was a pregnant woman simply trying to continue working to support herself, and instead she faced bullying, hostility, and ultimately job loss. The bullying included repeated gossip, false accusations, and favoritism that left her isolated in the workplace.

25.

Plaintiff suffered anxiety, humiliation, and stress from the constant harassment and from the fear for her health and her unborn baby's health while being forced to do heavy labor. Being terminated while pregnant—and the resulting financial uncertainty—exacerbated her anxiety and depression. Plaintiff also experienced physical strain and pain on days she was forced to overexert herself, as well as insomnia and other stress-related symptoms due to the hostile work environment. She continues to deal with the emotional fallout of these events, including worry about how she will provide for her child.

///

_Verified Correct Copy of Original 9/2/2025._

26.

As a result of Defendant's actions, Plaintiff has lost significant wages and benefits. She was removed from work in July 2025 and has remained unemployed since. She lost the opportunity to earn wages from July 2025 through the present (amounting to approximately $11,950 in lost wages to date, based on her $24.89 hourly rate and typical schedule), and she will continue to lose income for as long as she remains out of comparable employment. Additionally, Plaintiff lost employee benefits such as health insurance coverage (critical during pregnancy), totaling $840 in benefits. She will also lose out on the state-provided protected maternity leave and reemployment rights she would have had if still employed. Plaintiff seeks to recover all of these economic damages, including past lost wages and future lost earnings/benefits, to make her whole.

## JURISDICTION AND VENUE

27.

Plaintiff hereby incorporates and realleges paragraphs one (1) through twenty-six (26) into this section.

28.

Defendant is a domestic limited liability company, formed under the laws of the State of Oregon. Defendant is engaged in substantial and not isolated activities within the state. Personal jurisdiction is proper under ORCP 4A.

29.

This Court has subject matter jurisdiction over all claims asserted herein under the Oregon Constitution, Article VII, Section 9. This case does not contain any claims vested in another trial court.

///

_Verified Correct Copy of Original 9/2/2025._

30.

The Court also has jurisdiction over Plaintiff's federal law claims under concurrent jurisdiction, as those claims arise from the same facts and events.

31.

Venue is proper in Multnomah County, Oregon because the cause of action arose there. ORS 14.030; 14.080(1).

**PLAINTIFF'S FIRST CLAIM FOR RELIEF**

(Pregnancy Discrimination)

(Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act; ORS 659A.029 and 659A.030)

32.

Plaintiff incorporates and realleges paragraphs one (1) through thirty-one (31) into Plaintiff's first claim for relief against Defendant.

33.

Plaintiff was at all relevant times an "employee" as defined by Title VII (42 U.S.C. §2000e(f)) and ORS chapter 659A. Defendant is an "employer" subject to Title VII (42 U.S.C. §2000e(b)) and ORS 659A.001 et seq. Pregnancy discrimination is a form of sex discrimination prohibited by law. (See 42 U.S.C. §2000e(k) (Pregnancy Discrimination Act); ORS 659A.029 (discrimination "because of pregnancy" is deemed sex discrimination).

34.

Defendant, through its agents and supervisors, discriminated against Plaintiff because of her pregnancy and related medical needs. This discrimination took multiple forms, including but not limited to:

_Verified Correct Copy of Original 9/2/2025._

a. Failing to treat Plaintiff the same as other employees with similar ability or inability to work: Defendant denied Plaintiff the accommodations and assistance that it offered to non-pregnant employees. Instead, Defendant imposed an ultimatum on Plaintiff to "work or go home" knowing she was pregnant. This violates the mandate of equal treatment under the Pregnancy Discrimination Act.

b. Adverse Work Assignments: After learning of Plaintiff's pregnancy, Defendant intentionally assigned her more onerous and physically demanding tasks than other employees, as a way to punish or pressure her. Management allowed or instructed staff to give Plaintiff the hardest section and heavy workload specifically because of her pregnancy-related limitations. These actions altered the terms and conditions of Plaintiff's employment to her detriment because she was pregnant.

c. Hostile Work Environment: Defendant's employees and supervisors subjected Plaintiff to a hostile work environment permeated with discriminatory animus toward her pregnancy. This included derogatory and demeaning comments (such as insinuations that she was "using her pregnancy as an excuse", or that mistakes would be overlooked only because she was pregnant). It further included the spreading of false accusations by staff who were not present for certain events, but who nevertheless told others that Plaintiff had an "attitude" or was problematic, in order to damage her reputation. This gossip was reported directly to management. Plaintiff also endured favoritism in assignments that shielded other staff from difficult work while forcing Plaintiff into the hardest sections. It also included bullying behavior (e.g., Nurse Aja telling her to "take it or leave" when she sought accommodation, and Nurse Bree threatening to retaliate when Plaintiff objected to

_Verified Correct Copy of Original 9/2/2025._

harassment). The frequency and severity of these incidents created an abusive working environment that a reasonable pregnant employee would find hostile and that Plaintiff in fact found deeply upsetting. Defendant's management knew or should have known of this harassment (Plaintiff reported several instances to supervisors/HR) but failed to take prompt corrective action, thereby allowing the hostility to continue.

d. Disparate Discipline/Removal: Defendant removed Plaintiff from the work schedule and terminated her employment with no legitimate reason, shortly after she revealed her pregnancy and asserted her rights. In contrast, other non-pregnant employees were not removed or fired under similar circumstances. This timing and pattern raise a strong inference that Plaintiff's pregnancy was a motivating factor in the decision to terminate her.

35.

Plaintiff's pregnancy and need for pregnancy-related accommodation were motivating factors in the adverse actions taken against her, including her assignment to heavier work, the harassment she endured, and her ultimate termination. Direct evidence of discriminatory intent is seen in comments by Defendant's agents (e.g., references to her pregnancy as an "excuse"). Circumstantial evidence (timing, disparate treatment compared to others, sudden policy changes post-termination) also indicates that, but for Plaintiff's pregnancy, she would not have been treated in this manner or fired.

36.

The above conduct constitutes unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act (42 U.S.C. § 2000e-

_Verified Correct Copy of Original 9/2/2025._

2(a) and §2000e(k)), and in violation of ORS 659A.030(1)(a) and (b) (Oregon's sex discrimination statute, part of the Oregon Equality Act). Defendant discriminated against Plaintiff in compensation, terms, conditions, or privileges of employment, and/or limited or classified her in a way that adversely affected her opportunities because of her sex (pregnancy). Defendant employed 15 or more employees for 20 or more weeks in the year 2025.

37.

As a direct and proximate result of Defendant's pregnancy discrimination, Plaintiff has suffered economic damages of $12,790 (lost wages and benefits) and non-economic damages of $125,000 for emotional distress. She is entitled to recover these damages in an amount to be determined by a jury. Additionally, because Defendant acted with malice or reckless indifference to Plaintiff's protected rights, Plaintiff may amend hear pleadings to seek an award of punitive damages under Title VII (42 U.S.C. §1981a(b)(1)) and ORS 659A.885(3). Plaintiff also seeks her reasonable costs and attorney's fees, if she retains counsel, as allowed by 42 U.S.C. §2000e-5(k) and ORS 659A.885.

**PLAINTIFF'S SECOND CLAIM FOR RELIEF**

(Failure to Provide Reasonable Accommodations for Pregnancy)

(Oregon Workplace Accommodations for Pregnancy Act—ORS 659A.147)

38.

Plaintiff incorporates and realleges paragraphs one (1) through thirty-seven (37) into Plaintiff's second claim for relief against Defendant.

39.

Oregon employers are specifically required to provide reasonable accommodations to employees who have known limitations related to pregnancy, childbirth, or related medical

_Verified Correct Copy of Original 9/2/2025._

conditions, unless doing so would impose an undue hardship. ORS 659A.147(2) makes it an unlawful employment practice for an employer, because of an employee's known pregnancy-related limitations, to fail or refuse to make reasonable accommodation, to deny employment opportunities on the basis of the need for accommodation, or to take adverse action in retaliation for the employee requesting accommodation.

40.

At all relevant times, Defendant was an employer subject to ORS 659A.147. Plaintiff notified Defendant of her pregnancy and related limitations (lifting restrictions, etc.) in June 2025, which gave Defendant knowledge of her pregnancy-related limitations. Thus, ORS 659A.147 protections squarely applied to Plaintiff.

41.

Plaintiff requested reasonable accommodations for her pregnancy-related limitations. These included help with heavy lifting, light-duty assignments, and similar measures that were objectively reasonable and would not have caused undue hardship. Defendant failed and refused to provide these accommodations. Instead of accommodating Plaintiff, Defendant often insisted she perform all tasks without assistance or else take involuntary leave (go home). On at least one occasion, Defendant's supervisor effectively forced Plaintiff to take unpaid leave by telling her to go home if she wouldn't lift heavy residents alone. Forcing a pregnant employee off work in lieu of providing accommodations is precisely what ORS 659A.147 forbids.

42.

Further, Defendant denied Plaintiff employment opportunities and ultimately her job because of her need for accommodation. When Plaintiff asserted her right to work with accommodations, Defendant's response was to remove her from the schedule and terminate her,

_Verified Correct Copy of Original 9/2/2025._

rather than meet its obligation to accommodate. This is a form of discrimination based on pregnancy-related limitations. ORS 659A.147(2)(b) specifically prohibits an employer from taking adverse action (like firing or in any manner discriminating) against an employee for inquiring about or using the accommodations to which she is entitled. Plaintiff engaged in protected activity under this statute by requesting accommodations, and Defendant retaliated by terminating her.

43.

Defendant cannot claim that accommodating Plaintiff would have been an undue hardship. The accommodations sought (temporary lifting assistance and modified assignments) were routinely granted to others and would have been feasible given Defendant's staffing. Indeed, after Plaintiff's termination, Defendant instituted a formal process to handle such accommodations, undercutting any claim that doing so was unreasonable.

44.

Defendant's actions violated ORS 659A.147. By failing to accommodate Plaintiff's known pregnancy-related limitations and by effectively forcing her out of work due to those limitations.

45.

Plaintiff suffered harm as a result of Defendant's unlawful failure to accommodate and subsequent termination, consisting of $12,790 in economic damages (lost wages and benefits) and non-economic damages of $125,000 for emotional distress. Pursuant to ORS 659A.885, Plaintiff is entitled to her economic and non-economic damages to redress these harms. She also seeks punitive damages if available, given that the conduct was willful and showed a reckless disregard for Plaintiff's rights (Defendant was or should have been aware of the new accommodation requirements effective in Oregon and ignored them). Plaintiff further seeks appropriate injunctive

_Verified Correct Copy of Original 9/2/2025._

relief (such as requiring training of Defendant's management on pregnancy accommodations) and her costs and attorney fees as allowed by ORS 659A.885 and ORS 659A.150 et seq.

**PLAINTIFF'S THIRD CLAIM FOR RELIEF**

(Wrongful Discharge in Violation of Public Policy)

46.

Plaintiff incorporates and realleges paragraphs one (1) through forty-five (45) into Plaintiff's third claim for relief against Defendant.

47.

Oregon courts recognize a tort claim for wrongful discharge when an employee is terminated for a socially undesirable motive that contravenes public policy. In this case, Plaintiff's termination violated several fundamental public policies, including:

a. The policy against gender and pregnancy discrimination in the workplace (as embodied in Title VII and ORS 659A.030). Oregon law strongly favors the right of employees to be free from discrimination due to pregnancy, a matter of public concern (ORS 659A.006 declares employment free from discrimination to be a public policy of Oregon).

b. The policy of ensuring pregnant workers receive reasonable accommodations rather than being forced out (expressed in ORS 659A.147). Firing a worker who requests such accommodation undermines this policy.

c. The policy protecting employee health and safety, particularly for pregnant employees. Public policy (and OSHA regulations) encourage employees to avoid working under dangerous conditions and to speak up about health risks. Plaintiff was effectively terminated for insisting on safer working conditions for her

_Verified Correct Copy of Original 9/2/2025._

pregnancy—terminating her under those circumstances violates a basic societal interest in protecting prenatal health and worker safety.

d. The policy protecting whistleblowers and those who oppose unlawful practices (ORS 659A.199, ORS 659A.230, etc.). Plaintiff's case involves her being discharged after she reported and opposed what she reasonably believed to be illegal discrimination. Plaintiff provided these reports both orally and in writing, including an email to Administrator Sara Tijerina documenting retaliation and bullying. The written complaint proves that Defendant's management had direct knowledge of the misconduct and chose to ignore it.

48.

Plaintiff's employment was terminated primarily because she engaged in conduct related to the above public policies: she sought to assert her rights to a non-discriminatory workplace, to reasonable accommodation, and to take protected leave, and she complained about violations of law. These complaints included written reports to management, which constitute protected activity under Oregon's anti-retaliation laws.

49.

This wrongful discharge claim is pled in the alternative, to the extent that any of Plaintiff's statutory remedies might not fully vindicate the public policies at issue.

50.

Defendant's act of firing Plaintiff was wrongful and without just cause, and it was done with the improper motive of thwarting the above-mentioned public policies. Defendant (through its managers) acted with malice or at least with wanton disregard of those policies and of Plaintiff's

_Verified Correct Copy of Original 9/2/2025._

rights. The timing—coming days after Plaintiff's complaints to management and her union—underscores that the motive was retaliatory rather than legitimate.

51.

As a direct result of the wrongful discharge, Plaintiff suffered all the harms previously described: loss of employment, lost wages and benefits, and emotional distress including anxiety and depression, consisting of $12,790 in economic damages (lost wages and benefits) and non-economic damages of $125,000 for emotional distress. Plaintiff is also entitled to amend her pleadings to seek punitive damages under common law because Defendant's actions were willful, wanton and in reckless indifference to her rights (to the extent such damages are not duplicative of statutory punitive damages).

**PLAINTIFF'S FOURTH CLAIM FOR RELIEF**

(Unpaid Final Wages)

(ORS 652.140 and ORS 652.150)

52.

Plaintiff incorporates and realleges paragraphs one (1) through fifty-one (51) into Plaintiff's fourth claim for relief against Defendant.

53.

Under ORS 652.140(1), when an employer discharges an employee, all wages earned and unpaid become due and payable no later than the end of the first business day after the discharge. Defendant terminated Plaintiff (discharged her) on or about July 11, 2025. Plaintiff had earned wages for all work performed up to that date, including her regular hours from the beginning of the month through her last day worked (July 5, 2025).

///

_Verified Correct Copy of Original 9/2/2025._

54.

Defendant did not provide Plaintiff her final paycheck by the next business day (July 14, 2025). In fact, Defendant failed to issue the final pay for approximately 11 days after it was due. Records indicate that Plaintiff's final check was not made available until on or around July 25, 2025. This delay is a violation of ORS 652.140.

55.

The amount of unpaid wages in the final paycheck included approximately one week of work (July 1–5, 2025) at $24.89/hour for about 40 hours, totaling roughly $995.60 (gross).

56.

ORS 652.150 provides that if an employer willfully fails to pay final wages when due upon termination, the wages of the employee continue as a penalty from the due date until paid or until 30 days have passed, whichever is sooner. In Plaintiff's case, the final wages were about 11 days late (if paid July 25 when due July 14). Therefore, Plaintiff is entitled to penalty wages equal to her daily rate of pay for each day of delay. Plaintiff's daily wage (8 hours at $24.89/hour) is about $199.12 per day. For 11 days of delay, the penalty would be approximately $2,190.32.

57.

Defendant's non-payment was "willful" as defined by ORS 652.150 because Defendant had the ability to pay on time and knew the wages were due, yet chose not to. There was no legitimate reason for the delay; it was only after Plaintiff's persistent inquiries (and union involvement) that Defendant finally paid. This indicates indifference to the statutory obligation.

58.

By failing to timely pay all final wages due to Plaintiff, Defendant violated ORS 652.140. Consequently, Defendant is liable to Plaintiff for penalty wages under ORS 652.150.

_Verified Correct Copy of Original 9/2/2025._

59.

Plaintiff suffered financial hardship due to not receiving her paycheck when it was due—at a time when she was unemployed and preparing for a baby. The penalty wage statute is designed to compensate employees for this hardship and to deter employers from late payment. Plaintiff is entitled to recover the penalty wages as calculated above, plus any attorney's fees and costs under ORS 652.200 (which mandates fees to a prevailing employee in a wage claim). Although Plaintiff is pro se, she reserves the right to seek any costs or statutory fee-based compensation available. Plaintiff also seeks pre-judgment interest on the unpaid wages (ORS 82.010) from the date they were due until paid, to the extent not encompassed by the penalty.

60.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants for Plaintiff's first, second, third, and fourth claims for relief as follows:

a. For Plaintiff's first, second, and third claims for relief, an award of Plaintiff's economic damages of $12,790 and non-economic damages of $125,000, or whichever amounts are awarded by a jury, in the aggregate, and not cumulatively across claims;

b. For Plaintiff's fourth claim for relief, an award of economic damages of $2,190.32, or an amount to be awarded by a jury;

c. Pre- and post-judgment interest on any liquidated amounts under ORS 82.010;

d. An award for Plaintiff's costs and disbursements and a prevailing party fee; and

e. Any other relief that the Court deems just and proper.

_Verified Correct Copy of Original 9/2/2025._

DATED this 29 day of August 2025.

Iricia Spencer-Sanchez
Plaintiff, Pro Se
5114 NE 34th St. A5
Vancouver, WA 98661
Phone: 971-480-1289
Email: iriciaann471@gmail.com